# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT KROL, JR., | ) | |
| | ) | Civil Action No. 12 – 600 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| ROBERT COLLINS, *et al*., | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Pending before the Court is a Petition for Writ of Habeas Corpus filed by Robert Krol, Jr.

("Krol"), pursuant to 28 U.S.C. § 2254.  Petitioner challenges his judgment of sentence of twenty

to forty years imprisonment imposed following his conviction by a jury of third degree murder

and carrying a firearm without a license.  For the following reasons, the Petition will be denied.

### I.  Background

The relevant facts and procedural history of this case, as summarized by the Superior

Court on direct appeal, are as follows:

> On April 18, 2006, at approximately 2:46 a.m., Ambridge police officers
> found Miguel Ogbara shot to death in an empty lot in Ambridge, Pennsylvania,
> after an eyewitness reported the crime and described the assailant.  Police
> broadcast the suspect's description, and at approximately 4:40 a.m., Economy
> Borough Police Officer Daniel Viscuso observed Appellant, who matched the
> description, less than one-fourth mile of the crime scene.  Officer Viscuso
> approached Appellant, asked for identification, and relayed information about the
> stop to Ambridge police.  Ambridge Police Officers Zadock Dismuke and
> Michael Slawianowski and Sergeant Rick Bufalini, who were at the crime scene,
> responded to Officer Viscuso's call within minutes.  Appellant was taken to the
> Ambridge Police Department where he was detained for parole violations and the
> homicide investigation.

Appellant ultimately was charged with homicide and carrying a firearm without a license. Prior to trial, Appellant litigated a pretrial motion to suppress, which the trial court denied on May 11, 2007. At trial, Appellant testified that he had known Mr. Ogbara for twelve years, and he admitted to having an intimate relationship with the victim's wife, Melissa. The Ogbaras, who were separated, lived within one block of each other. Three or four days before the murder, when the victim discovered Appellant sleeping on Mrs. Ogbara's sofa, he beat Appellant and stole his necklace, gun, and $200. Without further explanation, Appellant stated that a day or two later, Dwayne Corrigan returned the gun Mr. Ogbara had taken. Appellant subsequently learned that he was on Mr. Ogbara's "hit list."

On the evening of April 17, 2006, Appellant went to a friend's apartment at about 8:00 p.m. and started drinking. Appellant, who was armed with his gun and baseball bat, decided to confront Mr. Ogbara. Accompanied by his friend Sam McCracken, Appellant went to the victim's street and hid alongside a neighbor's house. Appellant called Mr. Ogbara from McCracken's cellular telephone and told the victim that he was nearby at the First Street Apartments. When the victim exited his house and began walking toward the First Street Apartments, Appellant tossed away the baseball bat and started after Mr. Ogbara. As he walked across the vacant lot, Mr. Ogbara realized that Appellant was behind him, and the two men walked toward each other. Appellant said that he heard gun shots when the men were within a few feet of each other, and "[I] pulled out my gun and just started shooting." The victim was unarmed.

Eyewitness Michelle Keally observed the shooting from her bedroom window at 2:30 or 2:45 a.m. and described Appellant standing over the prone victim and firing multiple times at him. When Appellant fled the scene, Ms. Keally telephoned 911 and gave a description of the shooter. She testified that she never took her eyes from the victim while waiting for police and paramedics to arrive. Appellant said that he ran to the apartment building of Von McCraken, Sam's brother, [FN2] threw the gun in a storage area of the basement, and ran to Von's apartment.

[FN2] Appellant testified that he did not see Sam McCracken after Appellant used McCracken's telephone to call the victim.

Von McCracken testified that Appellant knocked on his door in the early morning hours of April 18, 2006, and appeared winded and nervous. Mr. McCracken stated that Appellant told him he had just shot Mr. Ogbara, that he threw his gun "by the creek," and he asked for a place to stay to avoid police. Initially, Mr. McCracken permitted Appellant to remain in the apartment, but when Mr. McCracken's girlfriend, Charmine Caracter, became upset, Mr. McCracken asked Appellant to leave. Appellant asked for a change of clothes,

[FN3] which Mr. McCracken provided, whereupon Appellant left the apartment. Ms. Caracter testified similarly, explaining that Appellant, who was extremely nervous and who looked out the window every "couple of minutes," stayed in the apartment about an hour until she and Mr. McCracken gave him a change of clothes and made him leave. It was at that point that Officer Viscuso stopped Appellant at 4:45 a.m. Beaver County Detective Timothy J. Straub found Appellant's gun across from the Big Sewickley Creek in Ambridge Borough.

> [FN3]  The clothes Von McCracken provided Appellant were nearly identical to the clothes Appellant wore when he shot the victim and matched the description of the clothing that Ms. Keally told police. Additionally, Appellant admitted that he changed his clothes in McCracken's apartment and left them behind when he was forced to leave. Eventually, as noted *infra*, police confiscated the clothing and tested it for gunshot residue.

> A jury acquitted Appellant of first degree murder and voluntary manslaughter and convicted him of third degree murder and the firearms violation. On June 6, 2007, the court sentenced Appellant to twenty to forty years imprisonment, consecutive to the sentence for which Appellant was on parole at the time of the instant crime; no further penalty was imposed for carrying a firearm without a license.

Commonwealth v. Krol, No. 1294 WDA 2007 (Pa. Super., filed July 28, 2009) (citations to the record omitted).

On appeal, the Superior Court affirmed Krol's judgment of sentence. Krol filed a *pro se* PCRA petition on December 8, 2009, after which PCRA counsel was appointed. Following a hearing, the PCRA court dismissed Krol's petition on July 27, 2010. The Superior Court affirmed the denial of PCRA relief on October 17, 2011. He filed the instant petition on May 7, 2012.

## II. Discussion

### A. Ineffective Assistance of Counsel

Krol's first claim is that the attorney who represented him in his suppression hearing, at trial and on direct appeal ("defense counsel") provided ineffective assistance when he failed to

impeach Officer Viscuso at both the suppression hearing and at trial, and then failed to bring to the attention of the Superior Court on appeal the false testimony of Officer Viscuso at these proceedings.

Pertinent to this claim is the following background information. After observing the shooting, the eyewitness, Michelle Keally, called 911 around 2:30 a.m. and gave a description of the assailant as wearing a dark or black hooded sweatshirt and jeans. She further described the assailant as a black man.[1] The 911 log notes from this incident indicate that the witness identified the shooter as a "young B/M" and a "young black male blk".

When asked at trial what description she gave to the 911 Center, Michelle Keally testified, "I believe I said, you know, I thought the gentleman was black at the time. After I had thought about it, the only thing I ever remember looking at other than the gun was to try to figure out what he was shooting at, I glanced down at Miguel. I didn't get too much of a description until after he was running away." During cross-examination by defense counsel Michelle Keally was asked the following question, "In fact, it was so shocking as you just testified that you didn't know when you called the police you thought it (the assailant) was a black man, right, that is the description you gave?" Keally answered, "Yeah, I think, I know I glanced down momentarily to see what, you know, if anything was being shot at. That is when I noticed the victim, and you know, in the frantic state of mind I may have just said it, looking at the victim, I didn't really start until the gentleman ran away to get his description."

Officer Viscuso of the Economy Borough Police Department testified at both the suppression hearing and at the trial in this case. On both occasions he testified that he was assisting the Ambridge Police in a search for a shooting suspect, which he described as "a white

---

[1] Krol is Caucasian.

4

male wearing a dark-colored black hoodie sweatshirt". After searching for 30 to 40 minutes, he observed an individual walking within approximately ¼ mile of the crime scene who fit the description of the suspect. He approached the individual who identified himself as Robert Krol. Officer Viscuso called Krol's name into County Dispatch and sat and talked with Krol until Ambridge Police arrived. Shortly thereafter, Sgt. Bufalini and two other Ambridge Police Officers arrived at Officer Viscuso's location. Sgt. Bufalini testified at the suppression hearing that he knew Krol to be on state parole and knew that he was in violation of his parole because he was out past curfew and obviously had been drinking.

Krol was taken to the Ambridge Police Department, where he was detained for the technical parole violations, and for the homicide investigation. Sgt. Bufalini testified that he notified Agent Richards from the Board of Probation and Parole Agency regarding Krol's violations. Agent Richards and Parole Supervisor Fronk responded to the Ambridge Police Department later that morning and filed a permanent detainer upon Krol for the technical violations. While he was detained and awaiting the arrival of his parole agent, the Ambridge Police also secured a search warrant for gunshot residue from Krol's hands and clothing.

Detective Patrick of the Beaver County District Attorney's Office questioned Krol as to the murder of Miguel Ogbara. Krol was given his Miranda rights and signed a Voluntary Statement Warnings sheet. Detective Patrick testified at the suppression hearing that he received a verbal statement from Krol, but the nature of the statement was not revealed in the court record.

Prior to trial, defense counsel filed an Omnibus Pre-Trial Motion to Suppress wherein he argued that Krol's arrest was effectuated without an arrest warrant and without probable cause. The Suppression Court disagreed because Sgt. Bufalini testified that he knew Krol was in

violation of his parole at the time of his apprehension, and, according to the court, this fact alone was enough probable cause to warrant detention. Additionally, the Suppression Court noted that Officer Viscuso's initial detention of Krol was in response to the police broadcast of an individual matching the description of the suspect, who was in the general area during early morning hours.

On appeal, the Superior Court concluded that the Suppression Court properly denied Krol's motion to suppress, but not on the existence of probable cause. Instead, the court found that the interaction between police and Krol began as an investigatory detention and that it was supported by reasonable suspicion pursuant to Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, because "there was a report of a murder in the area by an eyewitness, the eyewitness's description of the suspect was broadcast over the police radio, it was in the middle of the night, and Appellant, who matched the broadcast description, was stopped less than one-fourth of a mile from the crime scene." The Superior Court further found that because of the existence of exigent circumstances the transport of Krol to the police holding cell while he was undergoing investigative detention was reasonable and did not require probable cause. Specifically, "[i]t was known to the officers who detained [Krol] that he was an apparent parole violator, now implicated in a murder," and "[a]llowing [him] to walk free at that moment, while police pursued a search warrant for the gun-shot residue on his clothing and person, would be allowing a parole violator and possible murder suspect to destroy evidence or flee the jurisdiction." According to the Superior Court, detaining Krol while police contacted his parole officer was within the context of an investigative detention, not an arrest, and Sgt. Bufalini, who personally knew that Krol was in violation of his parole, "was justified in detaining [Krol] and contacting his parole officer mere hours after the original stop."

In his PCRA petition, Krol maintained that the race of the suspect was a vital point in the

Suppression and Superior Court finding that his detention, search and arrest were legal.  He

asserted a layered claim of ineffective assistance of counsel in that had defense counsel

impeached Officer Viscuso on the broadcast of the 911 call that the shooter was a black male, his

suppression motion would have been granted, and had defense counsel presented the correct

facts to the Superior Court, his appeal may have been decided differently.  He argued that

effective counsel would have used the discrepancy between the 911 log notes and Officer

Viscuso's testimony as grounds to attack the credibility of the Officer and to attack the legality

of his stop and detention.  With respect to this claim, the PCRA court found as follows:

> On cross-examination of defendant's witnesses at the P.C.R.A. Hearing, the
> Commonwealth did establish that the log notes had been given to defense counsel
> prior to the Suppression Hearing, defendant himself was aware of the contents of
> the log notes before the direct appeal was argued before the Superior Court,
> counsel did cross-examine the eyewitness, Michelle Keal[l]y, at trial about her
> report to the 911 Center that the assailant was a black male, the testimony and
> weight and credibility of Michelle Keal[l]y was for the finder of fact to solely
> decide, and, finally, and perhaps most important, the defense did have a strategy
> to pursue at the trial, that being that although defendant would and did admit that
> he shot Miguel Ogbara, his actions in that regard were justified because he acted
> in self defense.
>
> In order for the defendant to prevail on a layered ineffectiveness of counsel claim,
> he must first establish, by satisfying the three-prong test, that trial counsel was
> ineffective.  Only after the defendant has established that trial counsel was
> ineffective, then he must also establish, by satisfying the same three-prong test,
> that subsequent counsel was ineffective for failing to raise the meritorious claims
> that trial counsel failed to raise. Commonwealth v. McGill, 832 A.2d 1014, 1022
> (Pa. 2003).  Even though the burden is upon the defendant to establish that prior
> counsel provided ineffective representation, the defendant's evidence falls far
> short of that burden of proof by a preponderance of the evidence.  The mere entry
> into evidence of log notes prepared by two different operators, neither of whom
> testified in any proceeding, does not lead this Court to find that counsel's
> assistance to defendant was ineffective.  Neither counsel nor this Court can ignore
> the testimony provided by Officer Viscuso on two occasions to the effect that he
> was looking for a white male, nor can this Court ignore the law of this case, i.e.,
> the Superior Court has found in this case on direct appeal that Officer Viscuso did

have reasonable grounds to stop and detain the defendant.  Secondly, the trial record is clear that defense counsel did cross-examine the eyewitness, Michelle Keal[l]y, at trial about the very description she provided to the 911 operator on the morning in question.  Finally, defendant would have this Court focus upon one unexplained shred of evidence which was in possession of the defense prior to the Suppression Hearing, prior to trial and prior to argument on direct appeal, of the events of the morning hours of April 18, 2006, to the exclusion of all other evidence introduced in the Suppression Hearing and at trial and all other investigative work of the law enforcement authorities in the hours after the incident occurred.

Where, as here, the state courts have reviewed a federal issue presented to them and disposed of the issue on the merits, AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue.  *See* 28 U.S.C. § 2254(d) and (e).  In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d).  In Williams, the Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: (1) where the State court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or (2) where the State court decision "involved an unreasonable application of[] clearly established Federal law as determined by the Supreme Court of the United States."  Id. at 404-05.  The Court explained the two situations in the following terms:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13.  The Court of Appeals for the Third Circuit has also elucidated the "contrary to" clause by noting that "it is not sufficient for the petitioner to show merely that his

interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000) (quoting Matteo v. Superintendent, SCI-Albion, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*)). Moreover, the "unreasonable application" test is an objective one; "a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Jacobs v. Horn, 392 F.3d 92, 100 (3d Cir. 2005) (citation omitted). It is Petitioner's burden to prove the State court decision is either contrary to or an unreasonable application of clearly established federal law. *See* Matteo, 171 F.3d at 888; Werts, 228 F.3d at 197.

AEDPA also permits federal habeas relief where the State court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Krol's claim is one of layered ineffective assistance of counsel. To demonstrate that a "layered" claim of appellate counsel's ineffectiveness has arguable merit in Pennsylvania, the petitioner must develop all three prongs of the Pierce[2] test as to the ineffectiveness of trial counsel. *See* Commonwealth v. McGill, 832 A.2d 1014, 1022 (Pa. 2003); Commonwealth v. Rush, 838 A.2d 651 (2003). In other words, if a petitioner fails to develop any of the three Pierce prongs regarding the underlying issue of trial counsel ineffectiveness, he or she will have failed to establish the arguable merit prong of the claim of subsequent counsel's ineffectiveness. *See* Commonwealth v. Hall, 872 A.2d 1177, 1183-84 (Pa. 2005).

---

[2] In Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987), the Pennsylvania Supreme Court developed an ineffective assistance standard that requires a petitioner to demonstrate that (1) the underlying claim is of arguable merit, (2) counsel had no reasonable basis for the act or omission in question and (3) but for counsel's act or omission, the outcome of the proceeding would have been different.

The Pennsylvania ineffective assistance standard announced in <u>Pierce</u> has been found to be materially identical to the test enunciated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), and the Third Circuit has ruled that this standard is not "contrary to" <u>Strickland</u>. Werts, 228 F.3d at 204. Because the state court decided Krol's claim of layered ineffectiveness under the standard in McGill, which requires a petitioner to first satisfy the standard announced in <u>Pierce</u> with regard to trial counsel ineffectiveness, and that standard is essentially the same as the <u>Strickland</u> standard, Krol is barred from arguing that the state court decision is "contrary to" Supreme Court precedent. Krol could, however, argue for relief pursuant to the second part of the "contrary to" standard, i.e., that the state court reached a different result from that of the United States Supreme Court on a set of materially indistinguishable facts, but he has not done so and this Court is unaware of any such case.

It remains open to Krol that the state court's decision was an "unreasonable application" of federal law. In this regard, the Third Circuit has ruled that "the appropriate inquiry is whether the Pennsylvania courts' application of Strickland to [petitioner's] ineffectiveness claim was objectively unreasonable, i.e., the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under <u>Strickland</u>." Werts, 228 F.3d at 204. Krol, however, has not carried his burden.

To have been entitled to relief in state court, Krol had to show that defense counsel's representation fell below an objective standard of reasonableness, and there exists a reasonable probability that, but for counsel's error, the result would have been different.[3] Strickland, 466

---

[3] For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

U.S. at 687. According to Krol, he was prejudiced by defense counsel's error in failing to impeach Officer Viscuso's testimony, and he believes that had counsel done so then his pre-trial motion to suppress would have been granted.

In disposing of Krol's ineffectiveness claim, the PCRA court relied on "the law of the case", which, in this case, was the Superior Court's finding on direct appeal that Officer Viscuso had reasonable grounds to stop and detain Krol. The PCRA court also focused on the fact that defense counsel cross-examined the eyewitness, Michelle Keally, at trial about the description she provided to the 911 operator, and the fact that on two different occasions Officer Viscuso testified that he was looking for a white male. The court then concluded that counsel's assistance was not deemed ineffective simply because of the discrepancy between the 911 log notes describing the assailant as a black male and Officer Viscuso's testimony that he was looking for a white male wearing a dark-colored black hoodie sweatshirt.

With regard to his first claim, Krol has not shown that the state court unreasonably applied the law governing ineffective assistance of counsel claims to the facts of his case. Specifically, the state court identified the correct legal standard and determined that counsel was not ineffective because based on the evidence before it the result of Krol's suppression hearing and direct appeal would not have been different had defense counsel impeached Officer Viscuso with the race discrepancy in the 911 log notes or brought this to the attention of the Superior Court on direct appeal. Apart from its faulty reliance on the fact that Krol matched the

reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. With respect to the sequence of the two prongs, the Strickland Court held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. at 697.

description of the suspect that was broadcast over the police radio, both the Suppression Court and the Superior Court cited to other evidence that supported the legality of Krol's stop and initial detention. First, even though Officer Viscuso did not need any level of suspicion to stop and ask Krol for information, Krol was found in close proximity to the crime scene at an unusually late hour. Additionally, once Sgt. Bufalini recognized Krol as being on parole and committing technical violations, police had reasonable suspicion to conduct an investigatory detention and later transport him to the police station to wait while police contacted his parole officer. Given this evidence, the PCRA court found that it would not have made a difference in the ultimate outcome of Krol's suppression hearing and direct appeal even if both courts had been aware of the race discrepancy between the 911 log notes and Officer Viscuso's testimony. Because Krol could not show that he was prejudiced as a result of counsel's actions, it was not an unreasonable application of clearly established federal law for the state court to conclude that defense counsel was not ineffective. Krol has therefore failed to meet his burden under § 2254(d).

### B. Illegal Arrest

Krol next claims that his arrest was illegal for the reasons explained in relation to the previous claim and therefore his Omnibus Pre-Trial Motion to Suppress Evidence should have been granted. In Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court examined the nature of the exclusionary rule, which it characterized as a "judicially created means of effectuating the rights secured by the Fourth Amendment" and balanced its utility as a deterrent against the risk of excluding trustworthy evidence and thus "deflect[ing] the truthfinding process." Id. at 482, 490. Finding that, as to collateral review, the costs of the exclusionary rule outweighed the benefits of its application, the Court concluded that "where the State has provided an opportunity

for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494. While federal courts are not thus deprived of jurisdiction to hear the claim, they are – for prudential reasons – restricted in their application of the exclusionary rule. Id. at 494 n.37.

Seeking to avoid this restriction, Krol seizes upon the qualifying phrase in Stone, "where the State has provided an opportunity for full and fair litigation," and argues that he was denied such an opportunity because defense counsel did not exploit the fact that the eyewitness described the suspect as being a black male and he is white.

The Third Circuit has interpreted "opportunity for full and fair litigation" as requiring only that no structural defect in the system prevents state courts from hearing a petitioner's Fourth Amendment claim. Marshall v. Hendricks, 307 F.3d 36, 82 (3d Cir. 2002). However, Krol has made no showing that he was prevented from litigating his Fourth Amendment claim in the state courts or that his situation is similar to any that has been recognized as qualifying under Stone. At most, Krol alleges that his counsel was ineffective in litigating his motion to suppress, but counsel's effectiveness in this regard did not affect the state court's ability to hear Krol's claim. See Hubbard v. Jeffes, 653 F.2d 99, 103 (3d Cir. 1981) (holding that a petitioner had a "full and fair opportunity" to present his Fourth Amendment claim to the state courts despite his counsel's failure to raise the claim, because the "failure to do so was not brought about by any restriction of the opportunity by the state courts.") Accordingly, Krol is not entitled to relief on this claim.

**III. Certificate of Appealability**

Section 102 of the AEDPA, which is codified at 28 U.S.C. § 2253, governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." Where a district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Krol has not made a substantial showing of the denial of a constitutional right. Accordingly, the Court will not issue a certificate of appealability. A separate Order will issue.

Dated: June 26, 2015.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Magistrate Judge

Cc: Robert Krol
HX-1089
SCI Somerset
1600 Walters Mill Road
Somerset, PA 15510